Benjamin Heikali (SBN 307466)
**FARUQI & FARUQI, LLP**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Telephone: (424) 256-2884
Facsimile: (424) 256-2885
E-mail:   bheikali@faruqilaw.com

[Additional Captions on Signature Page]

*Attorney for Plaintiff David Thornton*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID THORNTON, Individually and on Behalf of All Others Similarly Situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No.   3:19-cv-02406 |
| | ) |
| MELLANOX TECHNOLOGIES LTD., IRWIN B. FEDERMAN, EYAL WALDMAN, STEVE SANGHI, AMAL M. JOHNSON, UMESH PADVAL, GLENDA MARY DORCHAK, JACK R. LAZAR, DR. DAVID PERLMUTTER, GREGORY L. WATERS and JON A. OLSEN, | ) **CLASS ACTION COMPLAINT FOR** ) **VIOLATIONS OF SECTIONS 14(a) AND** ) **20(a) OF THE SECURITIES** ) **EXCHANGE ACT OF 1934** ) ) **JURY TRIAL DEMANDED** ) ) |
| Defendants. | ) ) ) |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff David Thornton ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This action is brought as a class action by Plaintiff on behalf of himself and the other public holders of the common stock of Mellanox Technologies, Ltd. ("Mellanox" or the "Company") against the Company and the members of the Company's board of directors (collectively, the "Board" or "Individual Defendants," and, together with Mellanox, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a), SEC Rule 14a-9, 17 C.F.R. 240.14a-9, and Regulation G, 17 C.F.R. § 244.100, in connection with the proposed acquisition (the "Proposed Transaction") of Mellanox by NVIDIA International Holdings Inc. ("NVIDIA").

2. On March 11, 2019, the Board caused the Company to enter into an agreement and plan of merger ("Merger Agreement"), pursuant to which Mellanox stockholders will receive $125.00 in cash for each share of Mellanox common stock they hold (the "Merger Consideration").

3. On April 22, 2019, in order to convince Mellanox shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Proxy Statement on Schedule 14A (the "Proxy") with the Securities and Exchange Commission ("SEC"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4. While Defendants are touting the fairness of the Merger Consideration to the Company's shareholders in the Proxy, they have failed to disclose certain material information that is necessary for stockholders to properly assess the fairness of the Proposed Transaction, thereby rendering certain statements in the Proxy false and/or misleading.

5. In particular, the Proxy contains materially incomplete and misleading information concerning the financial projections for the Company that were prepared by the Company and relied on by Defendants in recommending that Mellanox shareholders vote in favor of the Proposed Transaction. The financial projections were also utilized by Mellanox's financial

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

advisors, J.P. Morgan Securities LLC ("J.P. Morgan") and Credit Suisse Securities (USA) LLC ("Credit Suisse"), in conducting certain valuation analyses in support of their fairness opinions.

6.      It is imperative that the material information that has been omitted from the Proxy is disclosed to the Company's shareholders prior to the forthcoming shareholder vote so that they can properly exercise their corporate suffrage rights.

7.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act, based on Defendants' violation of (i) Regulation G (17 C.F.R. § 244.100) and (ii) Rule 14a-9 (17 C.F.R. 240.14a-9). Plaintiff seeks to enjoin Defendants from holding the shareholder vote on the Proposed Transaction and taking any steps to consummate the Proposed Transaction unless, and until, the material information discussed below is disclosed to Mellanox stockholders sufficiently in advance of the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

10.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because Mellanox is headquartered in this District.

## PARTIES

11.     Plaintiff is, and at all relevant times has been, a Mellanox shareholder.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

12.     Defendant Mellanox is an Israeli corporation and maintains its United States corporate headquarters at 350 Oakmead Parkway, Suite 100, Sunnyvale, California 94085. Mellanox' common stock is traded on the NASDAQ under the ticker symbol "MLNX."

13.     Individual Defendant Irwin B. Federman has been the Chairman of the Company since June 2013, and a director since June 1999.

14.     Individual Defendant Eyal Waldman is the President and Chief Executive Officer of the Company and has been a director of the Company since March 1999.

15.     Individual Defendant Steve Sanghi has been a director of the Company since February 2018.

16.     Individual Defendant Amal M. Johnson has been a director of the Company since October 2006.

17.     Individual Defendant Umesh Padval has been a director of the Company since February 2018.

18.     Individual Defendant Glenda Mary Dorchak has been a director of the Company since July 2009.

19.     Individual Defendant Jack R. Lazar has been a director of the Company since June 2018.

20.     Individual Defendant Dr. David Perlmutter has been a director of the Company since May 2014.

21.     Individual Defendant Gregory L. Waters has been a director of the Company since June 2018.

22.     Individual Defendant Jon A. Olsen has been a director of the Company since June 2018.

23.     The Individual Defendants and Mellanox may collectively be referred to as "Defendants."  Each of the Individual Defendants herein is sued individually as well as in his or her capacity as an officer and/or trustee of the Company, and the liability of each arises from the

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public shareholders of Mellanox (the "Class").  Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any Defendant.

25.     This action is properly maintainable as a class action because:

a.     The Class is so numerous that joinder of all members is impracticable. According to the Proxy, as of December 7, 2018, there were approximately 54,542,557 shares of Mellanox common stock outstanding, held by hundreds to thousands of individuals and entities throughout the country.  The actual number of public shareholders of Mellanox will be ascertained through discovery;

b.     There are questions of law and fact that are common to the Class that predominate over any questions affecting only individual members, including the following:

      i)     whether Defendants disclosed material information that includes projected non-GAAP financial measures in violation of SEC regulations that constitutes a violation of Section 14(a) of the Exchange Act;

      ii)     whether the omission of the projected GAAP financial measures violates Section 14(a) of the Exchange Act;

      iii)     whether the omission of other material information described below renders the Proxy materially misleading in violation of SEC regulations which constitutes a violation of Section 14(a) of the Exchange Act;

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

    iv)  whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

    v)  whether Plaintiff and other members of the Class will suffer irreparable harm if compelled to vote their shares regarding the Proposed Transaction based on the materially incomplete and misleading statements in the Proxy; and

    vi)  whether Plaintiff and other members of the Class will suffer damages if the Proposed Transaction is consummated.

  c.  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class;

  d.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

  e.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for the party opposing the Class;

  f.  Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole; and

  g.  A class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

## SUBSTANTIVE ALLEGATIONS

26.  Mellanox is a fabless semiconductor company that designs, manufactures (through subcontractors) and sells high-performance interconnect products primarily based on the Ethernet and InfiniBand standards. The Company's products facilitate data transmission between servers, storage systems, communications infrastructure equipment and other embedded systems.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Mellanox's products include integrated circuits, adapter cards, switch systems, cables, modules, software, services and accessories. The Company uses their products to form a total end-to-end integrated networking solution focused on computing, storage and communication applications used in multiple markers, including cloud, Web 2.0, High Performance Computing, Big Data, machine learning, storage, telecommunications, financial services, and enterprise data centers.

27.     On March 11, 2019, Mellanox and NVIDIA announced the Proposed Transaction in a press release which states, in pertinent part:

> SANTA CLARA, Calif., and YOKNEAM, Israel, March 11, 2019 (GLOBE NEWSWIRE) -- NVIDIA and Mellanox today announced that the companies have reached a definitive agreement under which NVIDIA will acquire Mellanox. Pursuant to the agreement, NVIDIA will acquire all of the issued and outstanding common shares of Mellanox for $125 per share in cash, representing a total enterprise value of approximately $6.9 billion. Once complete, the combination is expected to be immediately accretive to NVIDIA's non-GAAP gross margin, non-GAAP earnings per share and free cash flow.
>
> The acquisition will unite two of the world's leading companies in high performance computing (HPC). Together, NVIDIA's computing platform and Mellanox's interconnects power over 250 of the world's TOP500 supercomputers and have as customers every major cloud service provider and computer maker.
>
> The data and compute intensity of modern workloads in AI, scientific computing and data analytics is growing exponentially and has put enormous performance demands on hyperscale and enterprise datacenters. While computing demand is surging, CPU performance advances are slowing as Moore's law has ended. This has led to the adoption of accelerated computing with NVIDIA GPUs and Mellanox's intelligent networking solutions.
>
> Datacenters in the future will be architected as giant compute engines with tens of thousands of compute nodes, designed holistically with their interconnects for optimal performance.
>
> An early innovator in high-performance interconnect technology, Mellanox pioneered the InfiniBand interconnect technology, which along with its high-speed Ethernet products is now used in over half of the world's fastest supercomputers and in many leading hyperscale datacenters.
>
> With Mellanox, NVIDIA will optimize datacenter-scale workloads across the entire computing, networking and storage stack to achieve higher performance, greater utilization and lower operating cost for customers.

6

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

"The emergence of AI and data science, as well as billions of simultaneous computer users, is fueling skyrocketing demand on the world's datacenters," said Jensen Huang, founder and CEO of NVIDIA. "Addressing this demand will require holistic architectures that connect vast numbers of fast computing nodes over intelligent networking fabrics to form a giant datacenter-scale compute engine.

"We're excited to unite NVIDIA's accelerated computing platform with Mellanox's world-renowned accelerated networking platform under one roof to create next-generation datacenter-scale computing solutions. I am particularly thrilled to work closely with the visionary leaders of Mellanox and their amazing people to invent the computers of tomorrow."

"We share the same vision for accelerated computing as NVIDIA," said Eyal Waldman, founder and CEO of Mellanox. "Combining our two companies comes as a natural extension of our longstanding partnership and is a great fit given our common performance-driven cultures. This combination will foster the creation of powerful technology and fantastic opportunities for our people."

The companies have a long history of collaboration and joint innovation, reflected in their recent contributions in building the world's two fastest supercomputers, Sierra and Summit, operated by the U.S. Department of Energy. Many of the world's top cloud service providers also use both NVIDIA GPUs and Mellanox interconnects. NVIDIA and Mellanox share a common performance-centric culture that will enable seamless integration.

Once the combination is complete, NVIDIA intends to continue investing in local excellence and talent in Israel, one of the world's most important technology centers. Customer sales and support will not change as a result of this transaction.

**Additional Transaction Details**

Post close, the transaction is expected to be immediately accretive to NVIDIA's non-GAAP gross margin, non-GAAP earnings per share and free cash flow. NVIDIA intends to fund the acquisition through cash on its balance sheet. In addition, there is no change to its previously announced capital return program for the rest of fiscal 2020. The transaction has been approved by both companies' boards of directors and is expected to close by the end of calendar year 2019, subject to regulatory approvals as well as other customary closing conditions, including the approval by Mellanox shareholders of the merger agreement.

**Advisors**

Goldman Sachs & Co. LLC served as exclusive financial advisor to NVIDIA and Jones Day served as legal advisor. Credit Suisse Group and J.P. Morgan Chase & Co. served as financial advisors to Mellanox and Latham & Watkins, LLP and Herzog Fox & Neeman served as legal advisors.

7

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Conference Call and Webcast Details**

NVIDIA will conduct a webcast at 5:30 a.m. PT today to discuss the transaction. The webcast and a copy of the presentation materials can be found on NVIDIA's Investor Relations website at **investor.nvidia.com**. A webcast replay and a copy of the webcast presentation materials will also be available at **investor.nvidia.com**.

**About Mellanox**

Mellanox (NASDAQ: MLNX) is a leading supplier of end-to-end Ethernet and InfiniBand smart interconnect solutions and services for servers and storage. Mellanox interconnect solutions increase datacenter efficiency by providing the highest throughput and lowest latency, delivering data faster to applications and unlocking system performance capability. Mellanox offers a choice of fast interconnect products: adapters, switches, software and silicon that accelerate application runtime and maximize business results for a wide range of markets including high performance computing, enterprise datacenters, Web 2.0, cloud, storage and financial services. More information is available at **http://www.mellanox.com/**.

28.     Fiscal year 2018 was a very strong year for the Company. On an individual quarter basis for fiscal year 2018, the Company posted average quarter over quarter increases of 28%, 864% and 750% in revenues, net income and net income per share – diluted, respectively.[1] Year over year, the Company increased revenue by 26%, GAAP operating income increased from a loss of $17.1 million to $112.1 million, GAAP net income increased from a loss of $19.4 million to $134.3 million, GAAP net income per diluted share increased from a loss of $0.39 to $2.46, and expenses remained flat.[2] All financial metrics show that Mellanox had an amazing fiscal year 2018.

29.     The Company publicly stated  that the strong year can be attributed to a strong demand for its InfiniBand product and sales of its Ethernet switches and LinkX cables and transceivers.[3] In regards to Mellanox's Ethernet business, the Company maintains over 69% of the merchant Ethernet adapter business at 25 gigabit and faster speeds, delivered record sales of Spectrum Ethernet switches, and begun shipping its new Spectrum-2 to select customers.[4] In

---

[1] Mellanox, 2018 Annual Report (Form 10-K), p. 49 (Feb. 21, 2019).
[2] Mellanox, EX-99.1 to Current Report (Form 8-K), p. 4 (Jan. 30, 2019).
[3] *Mellanox Q4 2018 Earnings Conference Call Transcript*, The Motley Fool, https://www.fool.com/earnings/call-transcripts/2019/01/30/mellanox-technologies-ltd-mlnx-q4-2018-earnings-co.aspx (last visited May 2, 2019).
[4] *Id.*

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

regards to Mellanox's InfiniBand business, the Company solidified its leadership in InfiniBand by releasing the HDR 200 gigabit InfiniBand solutions and, according to the latest top 500 list published in November 2018, the Company's InfiniBand solutions accelerate nearly 55% of the high performance computing and artificial intelligence platforms on the list, including the top three fastest supercomputers in the world. [5] The Company's strong 2018 performance lead Mellanox to provide guidance of double-digit revenue growth and operating margin expansion for fiscal year 2019.[6]

30.     In sum, it appears that Mellanox is well-positioned for financial growth, and the Merger Consideration fails to adequately compensate the Company's shareholders. It is imperative that Defendants disclose the material information they have omitted from the Proxy, discussed in detail below, so that the Company's shareholders can properly assess the fairness of the Merger Consideration for themselves and make an informed decision concerning whether or not to vote in favor of the Proposed Transaction.

**The Materially Incomplete and Misleading Proxy**

31.     On April 22, 2019, Defendants caused the Proxy to be filed with the SEC in connection with the Proposed Transaction.  The Proxy solicits the Company's shareholders to vote in favor of the Proposed Transaction.  Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.  However, the Proxy misrepresents and/or omits both required and material information that is necessary for the Company's shareholders to make an informed decision concerning whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

*Financial Projections that Violate Regulation G and SEC Rule 14a-9*

32.     The Proxy fails to provide material information concerning the Company's financial projections, which were developed by the Company's management and relied upon by

---

[5] *Id.*
[6] *Id.*

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

the Board in recommending that the shareholders vote in favor of the Proposed Transaction. Proxy 58. Certain of the financial projections also were relied upon by the Company's financial advisors, J.P. Morgan and Credit Suisse, in connection with their valuation analyses performed in support of their fairness opinions. *Id.* at 72, 78.

33.    The Proxy discloses several projected financial measures utilizing GAAP compliant terminology including Cost of Goods Sold; Gross Profit; Income from Operations; Income Before Taxes; Net Income; and Net Income Per Share. However, as further alleged below, the terms in fact are not GAAP compliant because Defendants have made significant adjustments to the calculation of these measures as disclosed in footnotes to the projection tables. The adjustments are vaguely described in the footnotes and the specific projected line item figures used to make the adjustments to the misleadingly labeled projections are not disclosed.

34.    The Proxy provides values for projected non-GAAP (Generally Accepted Accounting Principles) financial metrics for three different cases, Case 1, Case 2, and Case 3, (collectively, "Final Management Projections") from 2019-2022 for:  (1) non-GAAP Cost of Goods Sold ("COGS"); (2) non-GAAP Gross Profit; (3) non-GAAP Total Operating Expenses; (4) non-GAAP Income from Operations; (5) non-GAAP Income Before Taxes; (6) non-GAAP Net Income; (7) non-GAAP Net Income Per Share (items 1-7, collectively, "Non-GAAP Income Statement Items"); (8) EBITDA; (9) EBIT; (10) EBIAT; and (11) Unlevered free cash flows. Mellanox extrapolated its EBITDA, EBIT, EBIAT and Unlevered Free Cash Flow Projections until 2027. The Company fails to provide (i) the line items used to calculate these non-GAAP metrics or (ii) a reconciliation of these non-GAAP projections to the most comparable GAAP measures, in direct violation of Regulation G and consequently Section 14(a). *Id.* at 68-70.

35.    The Final Management Projections appear to contain a pro forma GAAP income statement, as the first disclosed items are Revenue, COGS, Gross Profit, Total Operating Expenses, Income from Operations, Income Before Taxes, Net Income and Net Income Per Share. However, for all the items, excluding revenue, there is a footnote following the presumably GAAP term. Each footnote states that the non-GAAP Income Statement Items are non-GAAP and adjusted by

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

some combination of share-based compensation expense, amortization of acquired intangibles, settlement costs, acquisition and other charges, restructuring and impairment charges, and tax effects and adjustments. *Id.* at 66 nn.1 & 4-5, 67 n.9. However, the Proxy fails to provide the values of any of these adjustments and fails to reconcile any of the non-GAAP Income Statement Items to their most comparable GAAP equivalents. *Id.* at 68-70. The omitted information is material because it was used to calculate and project critical projected financial measures utilized by the Board, J.P. Morgan, and Credit Suisse to recommend the unfair Merger Consideration, and its omission renders the Board's recommendation, the projected financials, J.P. Morgan's and Credit Suisse's valuations and the Merger Consideration misleading.

36.     Similarly, the Company defines EBITDA, EBIT, EBIAT, and Unlevered Free Cash Flow ("UFCF") as non-GAAP financial measures. *Id.* at 68 nn.10-12, 69 n.15. Once again, each one of these non-GAAP financial measures was adjusted by some combination of share-based compensation, share-based compensation net of tax, settlement costs, acquisition and other charges, restructuring and impairment charges, depreciation and amortization, amortization of acquired intangibles, and tax effects and adjustments. The Company again fails to provide the values of these line items and fails to reconcile EBITDA, EBIT, EBIAT or UFCF to their most comparable GAAP equivalents. *Id.* at 68-70. The omitted information is material because it was used to calculate and project critical projected financial measures utilized by the Board, J.P. Morgan, and Credit Suisse to recommend the unfair Merger Consideration, and its omission renders the Board's recommendation, the projected financials, J.P. Morgan's and Credit Suisse's valuations and the Merger Consideration misleading.

37.     When a company discloses non-GAAP financial measures in a Proxy that were relied on by a board of directors to recommend that shareholders exercise their corporate suffrage rights in a particular manner, the company must, pursuant to SEC regulatory mandates, also disclose all projections and information necessary to make the non-GAAP measures not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial measure disclosed or released with

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

the most comparable financial measure or measures calculated and presented in accordance with GAAP.  17 C.F.R. § 244.100.

38.     Indeed, the SEC has increased its scrutiny of the use of non-GAAP financial measures in communications with shareholders.  Former SEC Chairwoman Mary Jo White has stated that the frequent use by publicly traded companies of unique company-specific non-GAAP financial measures (as Mellanox included in the Proxy here), implicates the centerpiece of the SEC's disclosures regime:

> In too many cases, the non-GAAP information, which is meant to supplement the GAAP information, has become the key message to investors, crowding out and effectively supplanting the GAAP presentation.  Jim Schnurr, our Chief Accountant, Mark Kronforst, our Chief Accountant in the Division of Corporation Finance and I, along with other members of the staff, have spoken out frequently about our concerns to raise the awareness of boards, management and investors.  And last month, the staff issued guidance addressing a number of troublesome practices *which can make non-GAAP disclosures misleading*: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data.  I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.  I also urge again, as I did last December, that appropriate controls be considered and that audit committees carefully oversee their company's use of non-GAAP measures and disclosures.[7]

39.     The Company's failure to provide the line items and/or reconcile the non-GAAP financial measures is particularly misleading because of the names the Company chose for the disclosed projected non-GAAP metrics. With respect to the non-GAAP Income Statement Items, the Proxy makes it appear as if the Company has disclosed GAAP compliant measures. One of the most important pieces of information to determine the profitability of a company is GAAP net income. The Final Management Projections disclose "net income," a measure that is a classic GAAP measure but which has been adjusted significantly by Defendants to render it  a non-GAAP financial measure.  In other words, the use of the term "net income"  is misleading because the Company is using a well-known GAAP term but defining it a non-GAAP way. Moreover, the

---

[7]     Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (emphasis added) (footnotes omitted) (last visited May 2, 2019).

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Company's 10-K distinguishes between GAAP net income and non-GAAP net income and reconciles the non-GAAP net income.[8] The 10-K also distinguishes between the GAAP and non-GAAP versions of the other non-GAAP Income Statement Items but does not reconcile them all.[9]

40.     Additionally, the Company is not consistent with the names given to the adjustment items and the items disclosed in the Final Management Projections. Throughout the footnotes, the Proxy states that non-GAAP financial measures were adjusted for depreciation and amortization. Moreover, the External Management Projections even have depreciation and amortization listed as a line item. Proxy 66. However, certain adjustments state that only amortization of acquired intangibles or amortization including amortization of acquired intangibles were used. *Id.* at 66 n.1, 68 n.10.

41.     The difference in wording implies that there is a difference between amortization generally and amortization of acquired intangibles. Additionally, the Management Projections only disclose depreciation in contrast to the External Management Projections which state depreciation and amortization. Furthermore, the projections for depreciation and amortization given in the External Management Projections and the projections for depreciation given in the Final Management Projections is the same, implying that either all amortization is zero or depreciation also includes amortization. Either way, the inconsistent adjustments combined with the vaguely worded line items that could seemingly be zero is misleading.

42.     The Company also fails to address the probability of each case in the Final Management Projections. The different assumptions used in the three cases create substantial differences between the projected financials disclosed in each case. The Company did not express the probability of the cases or acknowledge if any one case was considered more than the others. This is misleading because it appears that all three cases are equally as likely, however that is clearly not true. Considering Mellanox's last fiscal year was a record-breaking one filled with substantial growth,[10] it would appear that one of the higher growth scenarios would be more likely.

---

[8] Mellanox, 2018 Annual Report (Form 10-K), p. 68 (Feb. 21, 2019).
[9] *Id.*
[10] Mellanox, 2018 Annual Report (Form 10-K), p. 49 (Feb. 21, 2019).

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

Whatever the more likely case is, one of the cases must be more likely than the others. The Company's failure to disclose the probabilities associated with the cases is materially misleading because it makes shareholders increase the relative weight of lower projections, thereby decreasing the value of the Company.

43.     Thus, in order to bring the Proxy into compliance with Regulation G as well as cure the materially misleading nature of the projections under SEC Rule 14a-9 as a result of the omitted information, Defendants must disclose the likelihood of each case in the Final Management Projections, provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures and/or disclose the line item projections for the financial metrics that were used to calculate the aforementioned non-GAAP measures.  Such projections are necessary to make the non-GAAP projections included in the Proxy not misleading.

### The Materially Misleading Financial Analyses

44.     Certain of the financial projections at issue were relied upon by the Company's financial advisors, J.P. Morgan and Credit Suisse, in connection with their valuation analyses and respective fairness opinions. Proxy 72, 78.  The opacity concerning the Company's internal projections renders the valuation analyses described below materially incomplete and misleading, particularly as a substantial amount of information has failed to be disclosed.  Once a registration statement discloses internal projections relied upon by the Board, those projections must be complete and accurate.

45.      With respect to J.P. Morgan's *Public Trading Multiples Analysis*, it appears that J.P. Morgan was extremely conservative in its valuation, thereby artificially decreasing the Company's value. J.P. Morgan selected five comparable companies and determined their multiple of price per share to Wall Street analyst consensus earnings per share for calendar year 2019 ("CY2019E P/E") and the multiple of firm value to Wall Street analyst consensus estimates of EBITDA ("CY2019E FV/EBITDA"). *Id.* at 73-74. The average CY2019 P/E for the comparable companies was 18.42 and the average CY2019E FV/EBITDA for the comparable companies was

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1  13.4. J.P. Morgan selected multiple ranges of 14x to 18x and 12x to 16x for the Company's

2  CY2019 P/E and CY2019E FV/EBITDA, respectively. *Id.* at 74.

3       46.    The chosen ranges seem too low in light of J.P. Morgan's own equity researcher's

4  analysis of Mellanox. In J.P. Morgan's latest equity report prior to the Merger Agreement, J.P.

5  Morgan's equity researcher determined the Company's price target by applying a 17x multiple to

6  Mellanox's 2019 earnings power.[11] The report notes "this may be a conservative multiple due to

7  [Mellanox]'s top tier margin profile versus the [SMid-cap semi] group."[12] While J.P. Morgan

8  selected a range that includes the 17x multiple the analyst used, J.P. Morgan's 14x to 18x range

9  does not seem to accurately reflect the Company's value in light of the peer group chosen and

10  factoring in that the 17x multiple is conservative. The mean and median of the CY2019E P/E from

11  the comparable companies is 18.42 and 18.9, respectively. Given that J.P. Morgan's multiple range

12  falls below both the mean and the median, that would imply this is a very conservative estimate.

13  A conservative estimate that does not call itself conservative is misleading to shareholders because

14  by definition the estimate will be lower than a medium or an aggressive estimate. J.P. Morgan's

15  failure to disclose that this is a conservative multiple is misleading because a shareholder reading

16  J.P. Morgan's analysis would expect the valuation to be an average, not conservative. Therefore,

17  the shareholders are being misled to believe that the Company is worth less than it really is.

18       47.    Additionally, J.P. Morgan's use of a 12x to 16x multiple for CY2019E FV/EBITDA

19  is misleading for the same reason. One of the companies J.P. Morgan included as a comparable

20  company to determine a CY2019E FV/EBITDA multiple for the Company appears to be an outlier.

21  Intel Corporation had a CY2019E FV/EBITDA of 7.7x. Proxy 74. Including Intel's CY2019E

22  FV/EBITDA in the calculation, the mean of the companies CY2019E FV/EBITDA is 13.4x, the

23  median is 15.8x and the standard deviation is 3.72. After normalizing the disclosed company's

24  data, Intel's 7.7x CY2019E FV/EBITDA has a z score of approximately -1.53 corresponding to a

25  p value of 0.063. While Intel's CY2019E FV/EBITDA might pass a 95% confidence test, the p

26

27  [11] J.P. Morgan, *Mellanox Technologies Equity Research Report*, p. 3 (Feb. 25, 2019).
   [12] *Id.*

28

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

value is concerning due to the sample size. With a sample size of five, the standard deviation is expected to be large due to the inherent inaccuracies of using a small sample to estimate a population value. However, Intel appears to be the only CY2019E FV/EBITDA that is skewing the data downward. If Intel is considered an outlier and therefore ignored, the mean of the data then becomes 14.83x, the median becomes 15.85x and the standard deviation becomes 2.22. Of the four remaining companies CY2019E FV/EBITDA, three comfortably fall within plus one standard deviation, and one is slightly below minus one standard deviation. With such a small sample size, it is not clear if Intel is definitively an outlier or not.

48.     J.P. Morgan did not disclose how it choose the range of 12x to 16x to use for the Company, so it is unclear how much consideration this low value was given. This is misleading because if J.P. Morgan did consider Intel relevant, then the range of 12x to 16x appears to be "generous" as the majority of the range is above the mean. However, when comparing the range to the median of 15.8x, the range appears to be conservative. In light of the J.P. Morgan equity report that states using a market average for Mellanox could be conservative due to Mellanox's top tier margins,[13] it is unclear if selecting a multiple range that falls squarely within the comparable range is correct. Furthermore, the inclusion of Intel's extremely low multiple could have further driven down the comparable group, causing J.P. Morgan to apply an even lower multiple to the Company. J.P. Morgan's failure to disclose the impact of Intel's multiple on its selection of a multiple range and J.P. Morgan's failure to state whether or not the valuation was conservative is materially misleading. An estimate that is influenced negatively by extreme outliers and/or is generally conservative but does not call itself conservative is misleading to shareholders because by definition the estimate will be lower than a medium or an aggressive estimate. J.P. Morgan's failure to disclose (i) that this is an artificially low and/or conservative multiple and (ii) why Intel was not considered an outlier is misleading because a shareholder reading J.P. Morgan's

---

[13] J.P. Morgan, *Mellanox Technologies Equity Research Report*, p. 3 (Feb. 25, 2019).

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

analysis would expect the valuation to be an average, not conservative. Therefore, the shareholders are being misled to believe that the Company is worth less than it really is.

49.     With respect to Credit Suisse's *Selected Companies Analysis*, it appears that Credit Suisse was also conservative in its analysis of the Company. Credit Suisse preformed a very similar analysis as J.P. Morgan's *Public Trading Multiples Analysis*, except Credit Suisse extended the analysis to include 2020 financial projections. Credit Suisse looked at four comparable companies and determined their enterprise values as a multiple of Adjusted EBITDA for calendar year 2019 ("CY2019E Adj. EBITDA") and 2020 ("CY2020E Adj. EBITDA"), and per share stock price as a multiple of estimated Adjusted EPS for calendar year 2019 ("CY2019 Adj. EPS") and 2020 (CY2020 Adj. EPS"). Proxy 80-81. Credit Suisse calculated average comparable company CY2019E Adj. EBITDA, CY2019E Adj. EPS, CY2020E Adj. EBITDA and CY2020E Adj. EPS of 12.68x, 16.9x, 11.4x and 13.3x, respectively. Credit Suisse choose multiple ranges of 9x to 13x, 12x to 16x, 8x to 12x and 10x to 14x for the Company's CY2019E Adj. EBITDA, CY2019E Adj. EPS, CY2020E Adj. EBITDA and CY2020E Adj. EPS, respectively. *Id.* at 81.

50.     The multiple ranges Credit Suisse chose for its analysis demonstrate the conservative nature of Credit Suisse's valuation. The high end of all the multiple ranges Credit Suisse selected either are totally below the average or, if the average is rounded up, match Credit Suisse's selected high end of the range. Moreover, Credit Suisse included four of the five companies J.P. Morgan used in its analysis. Notably, the company missing is MACOM Technology Solutions Holdings, Inc. According to J.P. Morgan's Analysis, MACOM has a high CY2019 P/E and CY2019E FV/EBITDA of 24.5x and 16.1x, respectively, which would directly translate to a high CY2019 Adj. EPS and CY2019E Adj. EBITDA. *Id.* at 74. Admittedly, Credit Suisse used slightly different metrics, but Credit Suisse's CY2019 Adj. EPS and CY2019 Adj. EBITDA numbers are almost identical to J.P. Morgan's CY2019 P/E and CY2019E FV/EBITDA, which would imply that had Credit Suisse calculated metrics for MACOM, Credit Suisse would have continued to have numbers almost identical to J.P. Morgan. Had Credit Suisse included MACOM in its analysis (using J.P. Morgan's calculations), the average for CY2019E Adj. EPS

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

and CY2019E Adj. EBITDA would be raised to 18.42 and 13.36, respectively. Although J.P. Morgan did not calculate 2020 metrics, presumably MACOM's would continue to be on the higher end of the spectrum. Therefore, Credit Suisse's CY2020E Adj. EBITDA and CY2020E Adj. EPS would also be raised by the inclusion of MACOM, as Credit Suisse's calculations almost mirror J.P. Morgan's. Additionally, Credit Suisse chose to include Intel in its analysis. As discussed in J.P. Morgan's analysis, Intel appears to be an outlier which drags the multiples down.

51.     Credit Suisse appears to have artificially decreased the Company's valuation by failing to include a comparable company with high multiples and  including an outlier comparable company with low multiples. Given Credit Suisse is depressing the Company's valuation, that would imply this is a very conservative estimate. A conservative estimate that does not call itself conservative is misleading to shareholders because by definition the estimate will be lower than a medium or an aggressive estimate. Credit Suisse's failure to disclose that conservative multiples were used and provide an explanation for why the low multiples of Intel were included but the higher multiples of MACOM were excluded is misleading because a shareholder reading Credit Suisse's analysis would expect the valuation to be an average, not conservative. Therefore, the shareholders are being misled to believe that the Company is worth less than it really is.

52.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy states J.P. Morgan used unlevered free cash flows for the Company for fiscal years 2019 through 2026 based on the Management Projections *Id.* at 76. Additionally,

> [b]ased on the Company management's estimate of a 2.5% terminal value growth rate in the industry in which the Company operates, J.P. Morgan calculated a range of terminal values of the Company at the end of this period by applying a perpetual growth rate ranging from 2.0% to 3.0% to the unlevered free cash flow of the Company during the final year of such period. The unlevered free cash flows and the range of terminal values were then discounted to present values using a range of discount rates from 10% to 12%, which were chosen by J.P. Morgan based upon an analysis of the weighted average cost of capital of the Company. These present values, when added together, resulted in an implied firm value for the Company. To calculate an estimated equity value per Company Share, J.P. Morgan then adjusted the implied firm value for the Company's net cash, and divided the result by the fully diluted number of the Company Shares outstanding.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

*Id.* The Company does not provide any of the information J.P. Morgan used in the *Discounted Cash Flow Analysis*. With respect to the 2.5% terminal value growth rate, the Company discloses a year over year revenue growth percent from 2026, the last year in the discounted cash flow analysis, to 2027, the terminal year, of 3%. *Id.* at 68-70. Presumably, this is the same value J.P. Morgan is referring to when J.P. Morgan states a 2.5% terminal value growth rate. Assuming it is, portraying the year over year revenue growth as 3% while J.P. Morgan used 2.5% is materially misleading. The terminal value represents a substantial portion of the Company's value in a discounted cash flow model, and to change a growth rate by 0.5% will make a substantial difference. In this case, it appears that J.P. Morgan made an adjustment down, which has the direct effect of reducing the value of the Company.

53.     Additionally, the Proxy does not disclose any of the inputs to calculate the Company's weighted average cost of capital, provides no explanation as to why J.P. Morgan chose a perpetual growth rate of 2% to 3% for the UFCF, does not provide the calculated terminal values, does not disclose the Company's net cash, nor the Company's shares outstanding. Furthermore, J.P. Morgan does not disclose how it treats share-based compensation. Since these line items and explanations were not disclosed, shareholders are unable to discern the veracity of J.P. Morgan's *Discounted Cash Flow Analysis*. Without further disclosure, shareholders are unable to compare J.P. Morgan's calculations with the Company's financial projections. The absence of any single piece of the above information renders J.P. Morgan's *Discounted Cash Flow Analysis* incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

54.     With respect to Credit Suisse's *Discounted Cash Flow Analysis*, the Proxy states Credit Suisse calculated the net present value of the projected after-tax UFCF of the Company for the eight calendar years ending December 31, 2026 included in the Management Projections, treating share-based compensation as a cash expense. *Id.* at 82. Additionally,

> Credit Suisse applied a range of terminal value multiples of 7.5x to 10.5x to the Company's 2027E Adjusted EBITDA (without deduction of share-based compensation) and discount rates to the unlevered free cash flow estimates based on each of the three cases included in the Management Projections and the

19

estimated terminal value ranging from 9.0% to 12.0%. The discounted cash flow analysis indicated the following approximate implied per share equity value reference ranges for the Company, as compared to the merger consideration[.]

*Id.* The Company does not provide any of the information Credit Suisse used in the *Discounted Cash Flow Analysis*. The Proxy does not disclose why Credit Suisse applied terminal value multiples of 7.5x to 10.5x, what the calculated terminal values were, why discount rates of 9% to 12% are appropriate, nor the Company's shares outstanding. Since these line items and explanations were not disclosed, shareholders are unable to discern the veracity of Credit Suisse's *Discounted Cash Flow Analysis*. Without further disclosure, shareholders are unable to compare Credit Suisse's calculations with the Company's financial projections. The absence of any single piece of the above information renders Credit Suisse's *Discounted Cash Flow Analysis* incomplete and misleading. Thus, the Company's shareholders are being materially misled regarding the value of the Company.

55.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions, in a discounted cash flow analysis a banker takes management's projections and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value . . . ." *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value . . .  The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions[.]

*Id.* at 1577-78 (footnotes omitted).

56.     In sum, the Proxy independently violates both (i) Regulation G, which requires a presentation and reconciliation of any non-GAAP financial to their most directly comparable GAAP equivalent, and (ii) Rule 14a-9, since the material omitted information renders certain statements, discussed above, materially incomplete and misleading.  As the Proxy independently contravenes the SEC rules and regulations, Defendants violated Section 14(a) and Section 20(a)

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

of the Exchange Act by filing the Proxy to garner votes in support of the Proposed Transaction from Mellanox shareholders.

57.     Absent disclosure of the foregoing material information prior to the special shareholder meeting to vote on the Proposed Transaction, Plaintiff and the other members of the Class will not be able to make a fully-informed decision regarding whether to vote in favor of the Proposed Transaction, and they are thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and 17 C.F.R. § 244.100 Promulgated Thereunder)

58.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

59.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

60.     As set forth above, the Proxy omits material information required by SEC Regulation G, 17 C.F.R. § 244.100, which therefore constitutes an independent violation of Section 14(a).  SEC Regulation G, among other things, requires an issuer that chooses to disclose a non-GAAP measure to provide a presentation of the "most directly comparable" GAAP measure, and a reconciliation "by schedule or other clearly understandable method" of the non-GAAP measure to the "most directly comparable" GAAP measure.  17 C.F.R. § 244.100(a).

61.     The failure to reconcile the numerous material non-GAAP financial measures included in the Proxy is a violation of Regulation G and constitutes a violation of Section 14(a).

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

62.    The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

63.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## <u>COUNT II</u>

**(Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder)**

64.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

65.    SEC Rule 14a-9 prohibits the solicitation of shareholder votes in Proxy communications that contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading[.]" 17 C.F.R. § 240.14a-9.

66.    Regulation G similarly prohibits the solicitation of shareholder votes by "mak[ing] public a non-GAAP financial measure that, taken together with the information accompanying that measure . . . contains an untrue statement of a material fact or *omits to state a material fact necessary in order to make the presentation of the non-GAAP financial measure . . . not misleading*." 17 C.F.R. § 244.100(b) (emphasis added).  The SEC's official public position is to enforce Regulation G in merger transactions by compelling target companies to amend solicitation material, including proxies, to comply with Regulation G.

67.    Defendants have issued the Proxy with the intention of soliciting shareholder support for the Proposed Transaction.  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things, the financial projections for the Company.

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

68.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).  The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

69.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading. The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

70.     The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

71.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a Proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

72.     Mellanox is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

73.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1  omissions are not corrected prior to the vote on the Proposed Transaction.

2    74.    Plaintiff and the Class have no adequate remedy at law.  Only through the exercise

3  of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate

4  and irreparable injury that Defendants' actions threaten to inflict.

5  <u>**COUNT III**</u>

6  **(Against the Individual Defendants for Violations**
   **of Section 20(a) of the Exchange Act)**

7

8    75.    Plaintiff incorporates each and every allegation set forth above as if fully set forth

9  herein.

10    76.    The Individual Defendants acted as controlling persons of Mellanox within the

11  meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as

12  officers and/or directors of Mellanox, and participation in and/or awareness of the Company's

13  operations and/or intimate knowledge of the incomplete and misleading statements contained in

14  the Proxy filed with the SEC, they had the power to influence and control and did influence and

15  control, directly or indirectly, the decision making of the Company, including the content and

16  dissemination of the various statements that Plaintiff contends are materially incomplete and

17  misleading.

18    77.    Each of the Individual Defendants was provided with or had unlimited access to

19  copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or

20  shortly after these statements were issued and had the ability to prevent the issuance of the

21  statements or cause the statements to be corrected.

22    78.    In particular, each of the Individual Defendants had direct and supervisory

23  involvement in the day-to-day operations of the Company and, therefore, is presumed to have had

24  the power to control or influence the particular transactions giving rise to the Exchange Act

25  violations alleged herein and exercised the same.  The Proxy at issue contains the unanimous

26  recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They

27  were thus directly involved in preparing the Proxy.

28

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF**
**THE SECURITIES EXCHANGE ACT OF 1934**

79.     In addition, as described herein and set forth at length in the Proxy, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

80.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

81.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

82.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.     Enjoining Defendants and all persons acting in concert with them from proceeding with the shareholder vote on the Proposed Transaction or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

C.     Directing Defendants to account to Plaintiff and the Class for all damages sustained as a result of their wrongdoing;

D.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

1    E.    Granting such other and further relief as this Court may deem just and proper.

2    ## JURY DEMAND

3    Plaintiff demands a trial by jury on all issues so triable.

4    Dated:  May 2, 2019

5                                                   Respectfully submitted,

6                                                   **FARUQI & FARUQI, LLP**

7    **OF COUNSEL:**                                By: _/s/ Benjamin Heikali_
                                                    Benjamin Heikali, Bar No. 307466
8    **FARUQI & FARUQI, LLP**                       10866 Wilshire Blvd., Suite 1470
                                                    Los Angeles, CA 90024
9    Nadeem Faruqi                                  Tel.: (424) 256-2884
10   James M. Wilson, Jr.                           Fax: 424.256.2885
     685 Third Ave., 26th Fl.                       Email: bheikali@faruqilaw.com
11   New York, NY 10017
     Telephone: (212) 983-9330
12   Email: nfaruqi@faruqilaw.com                   *Counsel for Plaintiff*
     Email: jwilson@faruqilaw.com
13
14   *Counsel for Plaintiff*

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          26
**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF
THE SECURITIES EXCHANGE ACT OF 1934**

## CERTIFICATION OF PROPOSED LEAD PLAINTIFF

I, David Thornton ("Plaintiff"), declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed a draft complaint against Mellanox Technologies, Ltd. (Mellanox") and its board of directors and has authorized the filing of a complaint substantially similar to the one I reviewed.

2.  Plaintiff selects Faruqi & Faruqi, LLP and any firm with which it affiliates for the purpose of prosecuting this action as my counsel for purposes of prosecuting my claim against defendants.

3.  Plaintiff did not purchase the security that is the subject of the complaint at the direction of Plaintiff's counsel or in order to participate in any private action arising under the federal securities laws.

4.  Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

5.  Plaintiff's transactions in Mellanox securities that are the subject of the complaint during the class period specified in the complaint are set forth in the chart attached hereto.

6.  In the past three years, Plaintiff has not sought to serve nor has served as a representative party on behalf of a class in an action filed under the federal securities laws, except as specified below:

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing information is correct to the best of my knowledge.

Signed this 2nd day of May, 2019.

David Thornton

| Transaction (Purchase or Sale) | Trade Date | Quantity |
|---|---|---|
| Purchase | 11/20/18 | 100 |
|  |  |  |
|  |  |  |